## NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 2, 2023

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 2, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 99939-2 |
| | ) | (consol. w/99941-4) |
| | ) | |
| JUSTIN LEWIS, | ) | |
| | ) | |
| Petitioner. | ) | |
| ------------------------------------------------------- | ) | En Banc |
| In the Matter of the Personal Restraint of | ) | |
| | ) | |
| ROBERT L. AYERST, | ) | |
| | ) | |
| Petitioner. | ) | Filed: <u>February 2, 2023</u> |
| _____ | ) | |

MADSEN, J.—The issue presented here is whether a lawyer who is licensed in Idaho but not in Washington is nevertheless a lawyer for purposes of the Sixth Amendment to the United States Constitution. Petitioners Robert Ayerst and Justin Lewis were represented at their criminal trials by Robert Van Idour. Though a licensed attorney in Idaho, Van Idour was never admitted to practice in Washington. Accordingly, Van Idour was not authorized to practice law when he represented the petitioners, along with 100 other indigent defendants in Asotin County. Van Idour's failure to gain admittance to the Washington bar is not just shockingly unprofessional—it is unethical

No. 99939-2 (consol. w/99941-4)

and indefensible. Such conduct is rightly subject to penalties in the form of professional censure and criminal liability. Indeed, Van Idour's law license has been suspended. As the body entrusted with regulating the legal profession in this state, we condemn Van Idour's behavior.

The case before us today asks not whether to mete out further punishment to Van Idour, however much it may be deserved. Rather, we are asked to determine the legal consequences of Van Idour's failure to obtain licensure in Washington. Ayerst and Lewis contend this failure resulted in a complete denial of counsel, which constitutes structural error and demands reversal of their convictions. While we agree Van Idour's actions violate our state licensure rules, we disagree that they amounted to a constitutional denial of counsel. Therefore, we affirm the Court of Appeals' denial of Ayerst's and Lewis's personal restraint petitions.

BACKGROUND

In 2016 and 2017, the State charged Ayerst and Lewis, respectively, with separate felonies in Asotin County. The trial court appointed Van Idour, an Idaho attorney with over 30 years of experience, as defense counsel. Both cases went to trial. Both defendants were convicted, and the Court of Appeals affirmed their convictions.[1] The underlying facts of those cases are not in dispute.

---

[1] Ayerst was convicted of attempted second degree burglary, second degree malicious mischief, and bail jumping. *State v. Ayerst*, No. 35867-4-III, slip op. at 1, 5 (Wash. Ct. App. Apr. 11, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/358674_ord.pdf. Lewis was convicted of first degree assault, first degree robbery, possession of a controlled substance, and possession of drug paraphernalia with weapon enhancements on the first two counts. *State v.*

2

No. 99939-2 (consol. w/99941-4)

Within a year of their convictions finalizing, Ayerst and Lewis filed for postconviction relief. They claimed that they were denied their state and federal constitutional right to counsel because Van Idour was not licensed to practice in Washington when he represented them. Ayerst also alleged that the presiding judge at trial, Judge Scott Gallina, engaged in criminal activities that violated the appearance of fairness doctrine and Ayerst's due process right to a fair and impartial tribunal.

The Court of Appeals denied the petitions. The court reasoned that while Van Idour was not licensed in Washington and thus was not acting as "'counsel' as that term is defined for constitutional purposes," the representation was not so egregious as that found to be per se reversible in other cases, such as representation by a person posing as a lawyer. *In re Pers. Restraint of Ayerst*, 17 Wn. App. 2d 356, 360-61, 486 P.3d 943 (2021) (quoting *City of Seattle v. Ratliff*, 100 Wn.2d 212, 217, 667 P.2d 630 (1983), and citing *Solina v. United States*, 709 F.2d 160, 167 (2d Cir. 1983)). Further, the court noted, Van Idour was a licensed attorney in Idaho, Van Idour *could* have been qualified to provide representation in accordance with the admission to practice rules (APR), there was no evidence Van Idour purposefully evaded state licensing procedures, and Van Idour could have been confused about the requirements. *Id*. at 362. Therefore, the court concluded that Ayerst and Lewis failed to allege facts suggesting Van Idour's licensing

---

*Lewis*, No. 35775-9-III, slip op. at 6-7 (Wash. Ct. App. Apr. 11, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/357759_unp.pdf.

3

No. 99939-2 (consol. w/99941-4)

problems were so severe as to require per se reversal; they did not request a reference hearing and thus did not establish a basis for relief. *Id.* at 363.[2]

Ayerst and Lewis petitioned for review separately in this court. Both claimed that the Court of Appeals' holding on their deprivation of counsel claims conflicts with this court's decision in *Ratliff*. Ayerst also sought review of his claims against Judge Gallina. Department Two of this court granted review only of the right to counsel issue and consolidated the two cases.

The parties include additional evidence in their supplemental briefing. The State presented Van Idour's November 2019 declaration filed in the Court of Appeals. In it, Van Idour declares he was admitted to the Idaho bar in 1980 and had practiced for over 30 years, including handling hundreds of criminal defense cases. In 2017, Van Idour began representing clients as a contract public defender in Asotin County under APR 8 and under the supervision of attorney Neil P. Cox. Van Idour states that he was notified in 2017 that his admission by motion requirements were met but that his admission under APR 8 was not granted.

The American Civil Liberties Union of Washington (ACLU), among others,[3] submitted amicus briefing that included Van Idour's stipulation to suspension. Van Idour stipulated to the following facts in the Washington State Bar Association (WSBA)

---

[2] After the court denied Ayerst's and Lewis's petitions, the Washington State Bar Association (WSBA) initiated disciplinary action against Van Idour. In June 2019, the Court of Appeals amended its opinions in both cases, noting the criminal charges filed against Judge Gallina and the WSBA disciplinary action against Van Idour.

[3] We received amici curiae briefing in support of the petitioners from the Office of Public Defense, the Defender Initiative and Washington Defender Association, and the ACLU.

4

disciplinary complaint: he was admitted to practice in Idaho and he was never admitted to practice in Washington; he told the Asotin County Board of Commissioners that he was in the process of applying for admission in Washington when seeking the county's indigent defense contract; in 2017, he applied to WSBA by motion under APR 3(c); and he was awarded the indigent defense contract, which he signed on January 29, 2017, requiring him to be a member of WSBA throughout the term of the contract (February 1, 2017 to January 31, 2018).

Van Idour further stipulated that he was not admitted to practice at the time he executed the contract and did not gain admission during the pendency of that contract, in which he represented over 100 clients. On February 20, 2017, Van Idour applied for limited admission to WSBA under APR 8(c), which was never approved. On October 6, 2017, Judge Gallina signed an order for limited admission to practice "purport[ing] to provisionally admit" Van Idour in Asotin County Superior Court to provide indigent services "in accordance with APR 8." Amicus Curiae Br. of ACLU, App. A. This order was backdated to February 1, 2017; it did not constitute admission to practice law, and Van Idour knew it did not constitute admission. On October 26, 2017, Van Idour was notified that his application for admission under APR 3(c) was approved and that he was required to take additional steps prior to gaining admission. A little over a month later, Van Idour received notice that his APR 8(c) application was denied because he did not meet the criteria for limited admission under the rule.

Van Idour states that he believed he was authorized to practice in Asotin County because he had applied for admission under APR 3(c) and 8(c), and because the court appointed him as counsel in February 2017. But, Van Idour agreed that neither the pending applications nor the court appointment actually authorized him to practice and that he should have confirmed his authorization with WSBA.

Accordingly, Van Idour stipulated to violating the rules of professional conduct by practicing law without authorization. WSBA noted Van Idour's lack of prior disciplinary record, his character and reputation, and his remorse as mitigating factors, and noted his lengthy experience was an aggravator. WSBA imposed the presumptive sanction of suspension. This court approved and suspended Van Idour for 18 months, enjoining him from seeking admission to WSBA during that time.

The State also included in its supplemental briefing an e-mail exchange between Asotin County employees and WSBA, inquiring into Van Idour's application status. The Asotin County Superior Court administrator, Tammy Tenny, e-mailed Van Idour on March 2, 2017, asking about the status of his Washington license. Van Idour responded on March 17 that WSBA's admissions department was processing his application. Several weeks later, Tenny called WSBA and spoke with the admissions department regarding Van Idour's application. The admissions representative said the application was submitted and could take up to six months to process. On September 5, 2017, Tenny again contacted WSBA admissions for an update on the application. The department responded that Van Idour's application was being reviewed by regulatory service

6

counsel. On October 26, 2017, Van Idour forwarded Tenny an e-mail from WSBA stating his application had been approved and the admissions process needed to be completed. On January 31, 2018, Judge Gallina received a message from Van Idour saying WSBA had alerted him that the court's backdated "Order of Conditional Admission" was not sufficient to allow him to practice in superior court.

ANALYSIS

At the outset, we note our disagreement with the Court of Appeals. If Van Idour was not acting as counsel as the Court of Appeals concluded, then regardless of whether his representation was not so egregious as that found to be per se reversible in other cases, Ayerst and Lewis were denied counsel and their cases, along with the other 100 cases in which he provided representation, must be dismissed. *See Ayerst*, 17 Wn. App. 2d at 361-62. However, if Van Idour was acting as counsel for purposes of the Sixth Amendment, then Ayerst and Lewis must demonstrate that Van Idour's representation was ineffective in order to obtain the reversal they seek.

As stated, Ayerst and Lewis claim their constitutional right to counsel was violated and they urge us to view that violation as structural error. Inherent in this argument is that the competence of the petitioners' attorney is irrelevant, as is whether the attorney's conduct prejudiced them because it is presumed.

Structural error is a special category of constitutional error. *State v. Wise*, 176 Wn.2d 1, 13-14, 288 P.3d 1113 (2012). "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the

7

No. 99939-2 (consol. w/99941-4)

framework of any criminal trial. Thus, the defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1907, 198 L. Ed. 2d 420 (2017) (alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). Structural errors are subject to automatic reversal; they deprive defendants of basic protections by which a trial cannot reliably function as a fair determination of guilt or innocence. *Fulminante*, 499 U.S. at 310. "Structural errors are rare and encompass only the most egregious constitutional violations." *State v. Paumier*, 176 Wn.2d 29, 46, 288 P.3d 1126 (2012) (Wiggins, J., dissenting); *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

This appears to be our first opportunity to explore the meaning of "counsel," as opposed to "effective counsel," under the federal constitution.[4] We review constitutional provisions and legal questions of first impression under a de novo standard. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004); *City of University Place v. McGuire*, 144 Wn.2d 640, 649, 30 P.3d 453 (2001). When addressing an issue of first impression, we may look to other jurisdictions for instruction. *In re Welfare of Colyer*, 99 Wn.2d 114, 119, 660 P.2d 738 (1983).

---

[4] The petitioners agree that the state and federal constitutions "provide the *equivalent right* to appointed counsel." Br. of Pet'r (Ayerst) at 4 (emphasis added) (citing cases); Br. of Pet'r (Lewis) at 3; *see also State v. Medlock*, 86 Wn. App. 89, 97-99, 935 P.2d 693 (1997) (finding "no basis to conclude CONST. art. I, § 22 (amend. 10) should be interpreted so as to provide more protection than the Sixth Amendment").

8

No. 99939-2 (consol. w/99941-4)

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." *United States v. Cronic*, 466 U.S. 648, 653, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). The Supreme Court has long recognized that the "'right to counsel is the right to the effective assistance of counsel.'" *Id.* at 654 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).

The purpose of the Sixth Amendment "illuminate[s]" the substance of the guaranty to effective assistance. *Id.* at 655. The right to counsel exists in order to protect the fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (citing *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)); *Cronic*, 466 U.S. at 655. The due process clause of the Fourteenth Amendment guarantees a fair trial and defines the elements of such a trial through the provisions of the Sixth Amendment and that provision's right to counsel clause. *Strickland*, 466 U.S. at 684. The Sixth Amendment states,

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)

A fair trial is therefore one where evidence is subjected to adversarial testing that is presented to an impartial tribunal for the resolution of issues that were defined prior to the proceeding. *Strickland*, 466 U.S. at 685; *Cronic*, 466 U.S. at 655 ("'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'" (quoting *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975))).

The Sixth Amendment protects the adversarial process and requires that the accused has "'counsel acting in the role of an advocate'" in order to meet the case of the prosecution. *Cronic*, 466 U.S. at 656 (quoting *Anders v. California*, 386 U.S. 738, 743, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967)). "When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred." *Id*. (footnotes omitted). But if the process loses its character as a confrontation between adversaries, the constitutional guaranty is violated. *Id.* at 656-57.

The presence of counsel at trial is not enough to satisfy the Sixth Amendment. *Strickland*, 466 U.S. at 685. The adversarial nature of our justice system requires not just counsel but *effective assistance* of counsel. *Id*. at 686; *Richardson*, 397 U.S. at 771 n.14. Put another way, the recognition of the right to counsel is "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Cronic*, 466 U.S. at 658.

10

No. 99939-2 (consol. w/99941-4)

The burden of proving a violation of the Sixth Amendment, particularly in the context of postconviction review, generally rests on the accused. *See id.* In *Strickland*, the Court reviewed an actual ineffectiveness claim based on specific errors by counsel and set out the well-known test to determine whether counsel's assistance was so defective as to demand vacation of a conviction. 466 U.S. at 686-87. The *Strickland* test requires first that a defendant show counsel's performance was deficient and that the attorney made "errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. Next, the defendant must show that the deficient performance prejudiced their case and that counsel's errors were so serious that they deprived the defendant of a fair trial with reliable results. *Id.*

The Court has also noted circumstances so likely to result in prejudice "that case-by-case inquiry . . . is not worth the cost." *Id.* at 692. "Most obvious" is the actual or constructive denial of counsel. *Cronic*, 466 U.S. at 659; *see also Strickland*, 466 U.S. at 692. There, prejudice is presumed. *Strickland*, 466 U.S. at 692. The essential nature of counsel also requires the conclusion that a "trial is unfair if the accused is denied counsel at a critical stage of [their] trial." *Cronic*, 466 U.S. at 659. Counsel who fails altogether to put the prosecution's case to adversarial testing is "presumptively unreliable." *Id.* Further, counsel may deprive a defendant of assistance of counsel when a conflict of interest renders that assistance ineffective. *Cuyler v. Sullivan*, 446 U.S. 335, 345-50, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).

11

No. 99939-2 (consol. w/99941-4)

To summarize, the Sixth Amendment protects the right to effective assistance of counsel. Courts analyze and remedy Sixth Amendment claims differently according to the context in which they arise. On this sliding scale, claims resting on specific errors by counsel require proof that the attorney provided deficient conduct and prejudiced the defense. *Strickland*, 466 U.S. at 687. Claims based on external circumstances can be established when a defendant is denied an attorney altogether or denied counsel at critical stages of a trial, or when counsel wholly fails to engage in the adversarial process. *See Cronic*, 466 U.S. at 659-60. "Thus, only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Id*. at 662.

With the foregoing principles in mind, we turn to the issue before us. Ayerst and Lewis claim complete denial of counsel because Van Idour was not licensed in Washington when he represented them. Therefore, we must consider whether an attorney must be licensed in the forum in which they appear in order to qualify as Sixth Amendment counsel. Essential to that question is the meaning of "counsel."

### "Counsel" under the Sixth Amendment

Ayerst and Lewis rely primarily on *Ratliff*, arguing that this court requires an attorney to be licensed in Washington in order to be considered "counsel." They also argue that pursuant to *Ratliff*, denial of counsel is per se reversible as structural error and accordingly they need not show prejudice.

12

No. 99939-2 (consol. w/99941-4)

We disagree that *Ratliff* controls in this case. Unlike in *Ratliff*, Van Idour is a licensed attorney who is in good standing in his state of licensure, not an APR 9 law student who has not completed their legal education, passed any bar exam, or been vetted for character and fitness to practice law, and who can practice only under limited circumstances. Similarly, federal courts considering this issue draw the same distinction, holding that the Sixth Amendment requires counsel to be a duly licensed attorney and does not condition constitutionality of licensure to a specific state.

In *Ratliff*, the issue concerned the constitutionality of law student representation of criminal defendants under APR 9. When Keith Ratliff appeared in Seattle Municipal Court without counsel, the trial judge questioned Ratliff and discovered that a legal intern, John Edwards, was assigned as defense counsel. Ratliff stated Edwards was representing him on a different matter, but the court summoned Edwards to appear on Ratliff's behalf. Edwards arrived, spoke briefly to Ratliff, and the court stated it intended to go forward with Ratliff's case. Edwards objected, asking for a continuance. Edwards argued that he needed to speak with another witness who was not present and that he felt that he could not defend Ratliff properly at that point. The city of Seattle objected. The court required Ratliff to proceed, allowing the defense to delay its case until the next trial date. Ratliff was convicted. He appealed, claiming he was denied effective assistance of counsel because, among other things, Edwards was prevented from consulting with his supervising attorney prior to trial. The Court of Appeals sua sponte raised the issue of per se denial of counsel. *Ratliff*, 100 Wn.2d at 213-15.

13

No. 99939-2 (consol. w/99941-4)

The *Ratliff* court began by noting the state constitution vests judicial authority in the state supreme court to determine who may and may not appear before the bar. *Id.* at 215. Using this authority, the court promulgated and adopted the Code of Professional Responsibility and APRs. These rules establish the minimum standards of conduct for persons admitted to practice, set sanctions for those who fail to meet the standards, and outline the minimum qualifications for admission to the state bar. *Id.* at 216. APR 9 interns are allowed a limited practice in Washington provided they meet certain requirements, which include having completed most of their education at an approved law school; being in good academic standing; and having an experienced, duly licensed member of WSBA as their supervising attorney, who assumes professional responsibility for the intern's work. *Id.* An intern can appear in court in some situations without a supervisor because the court has established safeguards to assure the intern is competent to serve the needs of their clients. *Id.* at 216-17. The court held the preceding safeguards sufficient to meet constitutional requirements of "counsel." *Id.* at 217.

*Ratliff* relied on *People v. Perez*, 24 Cal. 3d 133, 594 P.2d 1, 155 Cal. Rptr. 176 (1979), which found no constitutional infirmity with a supervised law student representing a criminal defendant in California. The *Perez* court reasoned that legal internships provided much needed trial experience to aspiring lawyers, and defendants with inexperienced trial attorneys bear similar risks as with law student representation. *Perez* held that the safeguards built into the legal intern system plus the need for practical experience for law students was constitutional. *Ratliff*, in turn, reasoned that the APR 9

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)

intern protections were similar to *Perez* and adopted its reasoning. 100 Wn.2d at 217-18. *Ratliff* concluded a criminal defendant will "obtain legal assistance sufficient to meet both federal and state constitutions" when parties comply with APR 9. *Id.* at 218.

Most relevant to the present case, *Ratliff* relied on federal case law to recognize that "'counsel' as used in the Sixth Amendment and Const. art. [I], § 22 includes only those persons authorized by the courts to practice law." *Id.* at 217 (citing *Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41, 42 (1st Cir. 1982) (prison inmates may not be represented by fellow inmates); *United States v. Taylor*, 569 F.2d 448, 450-51 (7th Cir. 1978) (defendant has no right to be represented by disbarred attorney); *United States v. Wright*, 568 F.2d 142, 143 (9th Cir. 1978), and cases cited therein (no right to lay representation); *Turner v. Am. Bar Ass'n*, 407 F. Supp. 451, 472-74 (N.D. Tex. 1975) (reviewing the historical context of "counsel" from England to America), *aff'd sub nom. Taylor v. Montgomery*, 539 F.2d 715 (7th Cir. 1976), *and Pilla v. Am. Bar Ass'n*, 542 F.2d 56 (8th Cir. 1976)). Relying on the federal courts' definition of "counsel," the *Ratliff* court concluded the law student's failure to comply with the APRs resulted in an "absolute denial of the right to counsel" that did not require a showing of prejudice. *Id.* at 219. The court limited its holding, noting "there was a denial of the right to counsel *in the circumstances of this case.*" *Id.* at 213 (emphasis added); *see also State v. Flores*, 197 Wn. App. 1, 13, 386 P.3d 298 (2016) ("The intern [in *Ratliff*] did not attain the status of 'counsel' in that circumstance.").

15

No. 99939-2 (consol. w/99941-4)

Here, the petitioners and amici focus on a single statement in *Ratliff* to argue that the case applies to more than law students: individuals "authorized to practice only under certain conditions, such as a legal intern, may be considered 'counsel' . . . *only* when [they] compl[y] with those conditions." 100 Wn.2d at 218.

The petitioners ask this court to read *Ratliff* as broadly as possible, but the statement they rely on is aimed at the facts of that case. *Ratliff* considered a sui generis issue—whether representation by a legal intern who did not consult with supervising counsel resulted in a denial of the right to counsel. The court was not faced with the question of whether an already-licensed attorney would similarly constitute a denial of counsel or, instead, should be evaluated as ineffective assistance of counsel. The *Ratliff* court explicitly stated that a denial of counsel occurred "in the circumstances of this case." 100 Wn.2d at 213.

Nor does *Ratliff*'s logic apply more broadly. That case reviewed the rules governing legal interns and found the interns provide constitutional counsel as long as the rules were followed. Significantly, APR 9 was adopted in Washington in 1970 and allows "*lesser qualified* persons to engage in limited practice." *Id.* at 216 (emphasis added). The rule was intended to achieve two goals: increase the competence of lawyers and increase access to justice. *See* APR 9(a) ("Supervised professional practice plays an important role in the development of competent lawyers and expands the capacity of the Bar to provide quality legal services while protecting the interests of clients and the justice system."). APR 9 sets out detailed requirements for legal interns. Before an

16

No. 99939-2 (consol. w/99941-4)

applicant may engage in limited practice, they must, among other things, complete two-thirds of their study at an approved law school; be in good academic standing; and have an experienced and duly licensed member of the bar with at least three years of experience as a supervisor, who assumes professional responsibility for their work. APR 9(b)(1)(A), (b)(2)(B), (c), (f)(2), (4).

APR 8(b)(ii)(1) provides that with permission of the court, a member of another state's bar may appear in any action "in association with an active lawyer member of the Bar, who shall be the lawyer of record therein, responsible for the conduct thereof, and present at [all] proceedings" and that "[t]he [application] shall be heard by the court or tribunal after such notice to the . . . adverse parties as the court or tribunal shall direct." The purpose of this rule is twofold: to provide "(1) reasonable assurance that the [out-of-state] attorney is competent and will conduct [themselves] in an ethical and respectful manner in the trial of the case, and (2) reasonable assurance that local rules of practice and procedure will be followed." *Hahn v. Boeing Co.*, 95 Wn.2d 28, 34, 621 P.2d 1263 (1980).

APR 9 interns have not graduated from law school, passed any bar exams, or been admitted to *any* state bar. *See United States v. Anderson*, 577 F.2d 258, 261 (5th Cir. 1978) (per curiam) ("Law school attendance does not convert an individual into an attorney."). Whereas, APR 8 aspirants have graduated from law school, passed a bar exam, demonstrated the requisite traits of character for membership, paid a licensing fee, taken a prescribed oath, and been added to the list of attorneys permitted to practice in at

17

least one jurisdiction.  *See* APR 8(b); Bruce A. Green, *Lethal Fiction: The Meaning of*

*"Counsel" in the Sixth Amendment*, 78 IOWA L. REV. 433, 446-47 (1993); *see also*

*Admission By Lawyer Bar Examination*, WSBA, March 3, 2022,

https://www.wsba.org/for-legal-professionals/join-the-legal-profession-in-

wa/lawyers/qualifications-to-take-the-bar-exam [https://perma.cc/L4MA-5P5E].

A legal intern is not wholly unqualified, but they have not met the educational and

training requirements to be a licensed attorney.  Failing to abide by APR 9 prevents a

properly licensed and qualified attorney supervisor from signing off on an intern's

work—in other words, the failure to adhere to APR 9 denies a defendant their right to

counsel.  As the State notes, this essentially results in layperson representation.  But an

otherwise-licensed attorney who does not adhere to APR 8 (or other admission to practice

rule) does not erase their legal training, prior experience, and previous admittance to

another state's bar.

*Ratliff* held law students' adherence to the APRs is constitutionally required, but it

does not follow that attorneys licensed outside of Washington must also follow the APRs

to qualify as constitutional "counsel" under *Ratliff*.  Rather, as *Perez* observed, "Every

violation of a rule respecting the practice of law does not require the reversal of the

judgment in the case in which the violation occurred."  24 Cal. 3d at 143.

Indeed, *Ratliff* provided insight into its reasoning by citing *Turner*, which provides

an "excellent historical analysis" of "'counsel'" as used in the Sixth Amendment.  *Ratliff*,

100 Wn.2d at 217; *see also People v. Felder*, 47 N.Y.2d 287, 294, 391 N.E.2d 1274, 418

No. 99939-2 (consol. w/99941-4)

N.Y.S.2d 295 (1979) (*Turner* offers the "proper perspective from which to interpret the word counsel."). *Turner* considered whether a criminal defendant had the right to unlicensed or lay representation. 407 F. Supp. at 473. The court began by tracing the history of legal practice to common law England, finding meaning in the delineation between barristers and solicitors: barristers were advocates in the English superior courts, while solicitors were advocates in county and magistrate courts. English lawyers were "called or invited to practice" only after a court was satisfied that the person was "fit to practice by virtue of [their] character and/or training." *Id*. at 474. These characteristics were "transplanted" in colonial America. *Id.* at 473-74. Every state set out minimal standards for bar applicants and, while admission standards were not uniform, the "tradition of admission upon qualification continued to exist from even the earliest times of the American legal experience." *Id.* at 474.

Next, *Turner* observed that statutory authority to enforce Sixth Amendment rights has existed since the beginning of this country through the Judiciary Act of 1789. *Id*. at 475; 1 Stat. 73, 92. *Turner* found no case interpreting that statute as allowing unlicensed laypersons to represent parties other than themselves at trial. *Id.* Today, the admission and practice of law has been delegated to state bar associations, with the courts typically retaining the ultimate authority to regulate the profession. *E.g.*, *Ratliff*, 100 Wn.2d at 215-16.

The tradition of admission by qualification continues most obviously in the practice of admission pro hac vice. *Reese v. Peters*, 926 F.2d 668, 669 (7th Cir. 1991).

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Courts grant motions allowing representation of lawyers admitted to *a* bar, but not necessarily their forum's bar. *Id.* at 670. This "enduring practice of admission pro hac vice demonstrates that there is no one-to-one correspondence between 'Counsel' and membership in the local bar." *Id.* Admission by qualification also continues in the admission process of state bar associations, which includes a moral character requirement. *See, e.g.*, *In re Johnson*, 1 Cal. 4th 689, 700, 822 P.2d 1317 (1992) ("Historically, admission was ordered following an oral examination of a candidate by the members of the court . . . . Modernly, since adoption of the State Bar Act, the administrative aspects of attorney licensing and discipline are performed by the State Bar in the first instance."); Tarra Simmons, *Transcending the Stigma of a Criminal Record: A Proposal to Reform State Bar Character and Fitness Evaluations*, 128 YALE L.J. FORUM 759, 766 (2019) ("Every state bar association has rules and standards governing bar admissions, including a test of moral character.").

The *constitutional* question of whether a practitioner qualifies as counsel "is whether the court has satisfied itself of the advocate's competence and authorized [them] to practice law." *Reese*, 926 F.2d at 670. The historical call of the court to practice has been replaced with the modern process of admission to a bar association and/or authorization by pro hac vice. Inherent in either scheme is court approval that an advocate is competent and that they possess the requisite legal training and moral character to practice law. *See id.*

No. 99939-2 (consol. w/99941-4)

The petitioners here agree with *Ratliff* (and *Turner*) that counsel, as used in the Sixth Amendment, encompasses only those individuals whom courts have deemed fit to practice by virtue of their training and good character. However, the petitioners do not recognize that courts have delegated this historical approval process to bar associations and/or pro hac vice authorization, and consequently, that licensure inherently includes an approval of an attorney's fitness to practice that is not limited by state lines. *See id.* ("[T]he sixth amendment does not mean one thing in Texas and another in Illinois. What matters for constitutional purposes is that the legal representative was enrolled [in a bar] after the court concluded that he [or she] was fit to render legal assistance.").

Instead, the petitioners urge us here to adopt a per se rule that the lack of admission in Washington State in accordance with court rules automatically results in denial of counsel. The petitioners do not provide authority requiring such a rule. Precedent from other jurisdictions counsels the opposite.

Case law interpreting the right to counsel distinguishes between nonattorneys who practice law and attorneys who fail to follow local practice rules. The former has been held to contravene the Sixth Amendment. The latter constitutes a technical violation that may demand professional and criminal sanction, but does not rise to the level of a constitution violation.

Courts have "uniformly recognized that a lay[person] masquerading as an attorney—that is, one who has never been a licensed attorney in any jurisdiction—can never be considered 'counsel' under the Sixth Amendment regardless of the skill

21

No. 99939-2 (consol. w/99941-4)

exercised by the lay[person]." *Cantu v. State*, 930 S.W.2d 594, 596 (Tex. Crim. App. 1996) (citing *Solina*, 709 F.2d at 166-67; *Vance v. Lehman*, 64 F.3d 119, 122 (3d Cir. 1995) (citing cases); *Bond v. United States*, 1 F.3d 631, 637 (7th Cir. 1993); *United States v. Hoffman*, 733 F.2d 596, 599-600 (9th Cir. 1984) (citing cases); *People v. Allen*, 220 Ill. App. 3d 772, 781, 580 N.E.2d 1291, 162 Ill. Dec. 872 (1991); *Commonwealth v. Thibeault*, 28 Mass. App. Ct. 787, 789-90, 556 N.E.2d 403 (1990) (citing cases); *State v. Smith*, 476 N.W.2d 511, 513 (Minn. 1991)); *see also Dauphin County Bar Ass'n v. Mazzacaro*, 465 Pa. 545, 555, 351 A.2d 229 (1976) (concluding third-party claimant representation by lay casualty adjusters constitutes unauthorized practice of law)). *But see United States v. Whitesel*, 543 F.2d 1176, 1179 (6th Cir. 1976). Courts have also "uniformly held" that a defendant is not denied counsel merely because their attorney was under suspension for a technical violation. *Cantu*, 930 S.W.2d at 597 (citing *Hunnicutt v. State*, 531 S.W.2d 618, 623-24 (Tex. Crim. App. 1976), *overruled on other grounds by Hurley v. State*, 606 S.W.2d 887, 890 (Tex. Crim. App. 1980); *Vance*, 64 F.3d at 123 n.1 (citing cases); *State v. Green*, 274 N.J. Super. 15, 26-27, 643 A.2d 18 (Ct. App. Div. 1994) (citing cases)).

In *Felder*, four criminal defendants were unwittingly represented by a person "masquerading as an attorney but in fact not licensed to practice law." 47 N.Y.2d at 291. The defendants were convicted. They sought collateral relief based on denial of effective assistance of counsel because their attorney had never been admitted to the New York bar or any other bar, and had not completed law school or otherwise satisfied the

22

requirements for legal practice. *Id*. at 291-92. The State argued that "counsel" was distinct from "attorney at law" under the Sixth Amendment, and consequently denial of effective representation was not equivalent to whether representation itself must be by a licensed attorney. *Id.* at 293. The State made this argument to distinguish ineffective assistance cases that required automatic reversal from denial of counsel claims, which the State asserted should rely on a showing of prejudice. *Id.* The *Felder* court rejected this distinction, holding that "counsel," as used in the Sixth Amendment, "can mean nothing less than a licensed attorney at law." *Id.* Therefore, the court concluded "inasmuch as these defendants were not represented by an attorney they were quite literally denied their right to assistance of counsel." *Id*. at 294.

In *Kieser v. New York*, 56 F.3d 16, 17 (2d Cir. 1995) (per curiam), a defendant was represented by an attorney who was a member of the New Jersey bar, but not the New York bar. When the defendant was arraigned, the attorney had been temporarily suspended for failure to pay bar dues; he was subsequently reinstated prior to the criminal trial but never moved in the New York court for pro hac vice admittance. *Id.* The defendant argued on appeal that the attorney's suspension and failure to ever seek admission in New York constituted a per se violation of the Sixth Amendment right to counsel. The *Kieser* court disagreed, reasoning that not every "technical defect in the licensed status of a defendant's representative amounts to a violation of the Sixth Amendment." *Id.* (citing cases). Most relevant here, *Kieser* stated that "[w]here [an] attorney has duly qualified and been admitted to practice in another jurisdiction but fails

23

No. 99939-2 (consol. w/99941-4)

either to seek admission pro hac vice or *to follow local court rules*, the violation is a technical defect that does not represent a Sixth Amendment violation." *Id*. (emphasis added) (citing *United States v. Bradford*, 238 F.2d 395, 397 (2d Cir. 1956) (no per se Sixth Amendment violation where attorney was duly admitted to state court but had failed to seek admission to federal court); *People v. Cornwall*, 3 Ill. App. 3d 943, 277 N.E.2d 766, 767-68 (1971) (same where out-of-state attorney had failed to seek admission pro hac vice); *State v. White*, 101 N.M. 310, 681 P.2d 736, 739 (Ct. App. 1984) (same where duly admitted out-of-state attorney failed to comply with local rules requiring that he be accompanied by local counsel)). *Kieser* concluded the defendant had shown no "defect of constitutional dimension." *Id*.; *see also Ferrara v. Keane*, 806 F. Supp. 472 (S.D.N.Y. 1992) (holding there was no denial of counsel when a defense attorney was not licensed to practice in New York but was licensed in New Jersey for more than 30 years and was familiar with general criminal procedure).

In *Solina*, 709 F.2d at 164, the Second Circuit Court of Appeals found a per se violation of the right to counsel when the defense attorney had repeatedly failed the New York bar exam and was not a member of *any* bar. But the court explicitly stated that a per se reversal was not always required. It was not, for example, intended when a technical defect in licensing existed. *Id*. at 167 & n.9. The Second Circuit has recognized the "narrowness of *Solina* and other holdings providing for per se violations." *Ferrara*, 806 F. Supp. at 474 (citing *Bellamy v. Cogdell*, 974 F.2d 302, 303, 306-08 (2d Cir. 1992)). *Bellamy* observed that per se violations were limited to those cases where

24

No. 99939-2 (consol. w/99941-4)

trial counsel was not licensed to practice "because of a failure *ever* to meet the substantive requirements for the practice of law" or where counsel was implicated in the defendant's offenses. 974 F.2d at 306 (emphasis added).

As the above cases demonstrate, Ayerst and Lewis were not denied counsel. *See Kieser*, 56 F.3d at 17. Unlike the defense attorneys in *Felder* and *Solina*, who were never admitted to *any* bar, when Van Idour represented the petitioners he was duly licensed to practice law in Idaho. He therefore qualifies as counsel under the Sixth Amendment.

Further, Van Idour's flawed application under APRs 3 and 8 does not amount to a denial of counsel. Though Van Idour displayed a shocking disregard for the admission process, he did apply. He was approved for admission by APR 3(c) in October 2017 and instructed to complete additional steps. A month later, Van Idour was alerted that he was denied admission under APR 8(c). As the Second Circuit recognized, not every technical defect in an attorney's license status rises to the level of a Sixth Amendment violation. *Kieser*, 56 F.3d at 17 (citing *United States v. Novak*, 903 F.2d 883, 888 (2d Cir. 1990); *Solina*, 709 F.2d at 167; *Waterhouse v. Rodriguez*, 848 F.2d 375, 382-83 (2d Cir. 1988)).

<u>Conflict of Interest</u>

The petitioners and amici also contend that Van Idour was not acting as constitutional counsel because his lack of state licensure created a conflict of interest. For the reasons that follow, we disagree.

The Sixth Amendment protects a criminal defendant's right to effective assistance of counsel free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct.

25

No. 99939-2 (consol. w/99941-4)

1097, 67 L. Ed. 2d 220 (1981); *State v. Myers*, 86 Wn.2d 419, 424, 545 P.2d 538 (1976). To show a violation of the Sixth Amendment right to conflict-free counsel, a defendant must demonstrate that a conflict adversely affected their attorney's performance. *State v. Dhaliwal*, 150 Wn.2d 559, 571, 79 P.3d 432 (2003) (citing *Mickens v. Taylor*, 535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)); *see also Strickland*, 466 U.S. at 692 (noting the rule in conflict cases is "not quite the per se rule of prejudice" as in other Sixth Amendment claims). A defendant bears the burden of proving an actual conflict adversely affected their lawyer's performance at trial. *Dhaliwal*, 150 Wn.3d at 573. To prove a conflict adversely affected a lawyer's performance, a defendant must show either that the conflict caused a lapse in representation "'contrary to the defendant's interests'" or "'likely affected'" some aspects of the attorney's advocacy. *State v. Kitt*, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019) (internal quotation marks omitted) (quoting *State v. Regan*, 143 Wn. App. 419, 428, 177 P.3d 783 (2008)). Ayerst and Lewis argue that Van Idour had an actual conflict, relying on *Solina*'s discussion of conflict of interest for advocates posing as attorneys.

In *Solina*, the court applied a per se rule of reversal for a defendant who was represented by a person masquerading as a lawyer. The court reasoned that an advocate "who would knowingly commit the crime of unlicensed practice of law would inevitably suffer from serious constraints on their ability to provide effective representation" at trial. *Waterhouse*, 848 F.2d at 382. A vigorous defense, *Solina* reasoned, could lead others to inquire into the advocate's background and discover their lack of credentials. 709 F.2d at

26

No. 99939-2 (consol. w/99941-4)

164. *United States v. Cancilla*, 725 F.2d 867 (2d Cir. 1984), repeated this rationale where a defendant was represented by licensed counsel who was guilty of the same criminal conduct for which the defendant was accused. The Second Circuit has applied the per se rule "'without enthusiasm'" and "never" expanded it beyond the "egregious conduct" in *Solina* and *Cancilla*. *Waterhouse*, 848 F.2d at 383 (quoting *Solina*, 709 F.2d at 169). The *Kieser* court clarified that it has never suggested that conflict of interest alone was sufficient to invoke a per se rule of reversal in cases involving technical violations like the failure to move for pro hac vice admission. 56 F.3d at 17.

Here, Van Idour was a member of the Idaho bar when he represented the petitioners but was not admitted to practice in Washington. Although this exposes him to a possible charge of guilty of the unlawful practice of law, there was no actual conflict of interest in his representation of Ayerst and Lewis. Unlike the individual masquerading as an attorney in *Solina* or the attorney in *Cancilla* who was guilty of the same crimes as his client, Van Idour was not facing the same crimes as the petitioners, who were convicted of burglary and assault among other things.

Though we have held the unlawful practice of law to be a strict liability crime requiring no evidence of intent to commit wrongdoing, *State v. Yishmael*, 195 Wn.2d 155, 165-72, 456 P.3d 1172 (2020), conflict of interest based on an attorney's criminal activity does require knowledge. *See Solina*, 709 F.2d at 164. When an unlicensed advocate *knowingly* appears in court without a court's permission or proper licensure from the bar, they commit a fraud on the court and the crime of unauthorized practice of

27

No. 99939-2 (consol. w/99941-4)

law. *Blanton v. United States*, 896 F. Supp. 1451, 1464 (M.D. Tenn. 1995); *Yishmael*, 195 Wn.2d at 165-72. This affects an advocate's duty of loyalty to their client, encouraging the advocate to protect themselves by presenting a less-than-vigorous defense. *Blanton*, 896 F. Supp. at 1464. But if that advocate believes they are properly licensed or otherwise permitted to practice law, no conflict of interest exists. *Id.* "As far as the advocate is concerned, [they are] not committing a crime and ha[ve] no reason to give [the] client less than complete and zealous representation." *Id.* Van Idour believed, however incorrectly, that he was permitted to practice in Asotin County and did so openly with the trial court's knowledge and permission in some 100 cases. He had no reason not to vigorously defend Ayerst and Lewis for fear he would be exposed to criminal liability.

The petitioners do not argue, and there is nothing in the record to indicate, that Van Idour failed to vigorously defend them. *See Dhaliwal*, 150 Wn.2d at 573 (scrutinizing the trial performance of a lawyer accused of conflict of interest). There is no evidence at all about Van Idour's representation at trial. Thus, the petitioners fail to demonstrate that Van Idour's license status constitutes a lapse in representation contrary to the petitioners' interests or that it "'likely affected'" some aspect of Van Idour's advocacy. *Kitt*, 9 Wn. App. 2d at 243 (internal quotation marks omitted) (quoting *Regan*, 143 Wn.2d at 428).

As other courts have held in the circumstances presented here, we hold that an attorney licensed outside the jurisdiction in which they practice qualifies as counsel under

28

the Sixth Amendment.  Under the facts of this case, Van Idour was licensed and in good standing in Idaho and therefore meets the definition of counsel.

Ayerst and Lewis did not raise the issue of ineffective assistance, request a reference hearing, or allege facts suggesting Van Idour failed to effectively represent them.  They have not established a basis for postconviction relief.

CONCLUSION

Nothing we have said today absolves Van Idour of his appalling conduct.  As a professional and ethical matter, this behavior calls for condemnation and sanction.  As a legal issue, however, the weight of precedent persuades us that Van Idour's representation did not violate the Sixth Amendment.  Looking to other jurisdictions for guidance, we hold that the Sixth Amendment requires "counsel" to be a duly licensed attorney.  The Sixth Amendment does not impose a forum-specific requirement.  Van Idour had an Idaho bar license, therefore he qualifies as counsel under the Sixth Amendment.  Accordingly, we reverse the Court of Appeals' holding that Ayerst and Lewis were denied constitutional counsel, but we affirm the court's resolution to deny their personal restraint petitions.

29

No. 99939-2 (consol. w/99941-4)

_____
Madsen, J.

WE CONCUR:

_____          _____


_____          _____
Johnson, J.

_____          _____
Owens, J.

_____          _____
Stephens, J.                                Maxa, J.P.T.

30

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

No. 99939-2 (consol. w/99941-4)

GORDON McCLOUD, J. (dissenting)—Two fundamental principles must guide our analysis in this case. First, under both the federal and state constitutions, criminal defendants are entitled to the assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). Denial of counsel at a critical stage of the proceedings constitutes structural error requiring reversal. *City of Seattle v. Ratliff*, 100 Wn.2d 212, 219-20, 667 P.2d 630 (1983) (citing *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978)).

Second, this court has the inherent power to determine who may practice law in the state of Washington. WASH. CONST. art. IV, § 1. To that end, we have created comprehensive rules for admission to practice law in this state. Our admission rules serve an important purpose: they "'guard the public and its confidence in the judicial system.'" *In re Bar Application of Simmons*, 190 Wn.2d 374, 387, 414 P.3d 1111 (2018) (quoting *In re Belsher*, 102 Wn.2d 844, 850, 689 P.2d 1078 (1984)). Those rules require people seeking admission to practice law in

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

Washington to meet minimum educational, moral character, and fitness to practice requirements—requirements that touch on core issues of attorney competence, diligence, and honesty. In the criminal context, our requirement that an attorney obtain a license to practice in Washington before practicing law here is inextricably intertwined with the right to assistance of counsel ensured by the state and federal constitutions.

In this case, Robert Van Idour, an attorney who was licensed in Idaho but never in Washington, sought out an indigent defense contract in Washington.  He got that contract.  He began representing clients.  Yet he never obtained licensure in this state. The majority concludes that Van Idour's Idaho licensure sufficed. But the majority ignores the connection between our admission rules and the right to counsel. It casts the requirement that an out-of-state attorney obtain authorization to practice in this state as a mere technical formality that bears no connection to the constitutional right to counsel.

I respectfully disagree.  The majority reaches its result by relying on nonbinding, mostly inapposite federal case law and ignoring the clear holding of our own controlling precedent: *Ratliff*, 100 Wn.2d 212.  In that decision, we held that a person who is authorized to practice law in certain limited conditions may be considered "counsel" for constitutional purposes "*only* when he or she complies

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

with those conditions." *Id.* at 218. We also held that representation by a person not authorized to practice constituted a total deprivation of counsel—a structural error requiring reversal. *Id.* at 220-21. We grounded this analysis in the federal and state constitutions. *Id.* at 217.

I would therefore hold that *Ratliff* governs, that it applies to this case, and that it compels reversal. To be sure, not every violation of an admission or practice rule constitutes total denial of counsel. Some rule violations *can* be merely "technical." But Van Idour's violations were not. Van Idour knowingly failed to comply with several important prerequisites to practicing law in Washington that bear on his competency and accountability. For example, he never took the mandatory exam designed to test substantive knowledge of Washington law, he made knowing misstatements about his admission status, and he violated the basic condition that a person obtain authorization from *this* court before beginning to practice law in this state. These are not "technical" violations. The last one, in particular, is a violation that deprived this court and the Washington State Bar Association (WSBA) of the ability to evaluate whether he met the most basic qualifications necessary to provide competent legal services. Under *Ratliff*, these violations resulted in the total denial of counsel for petitioners Justin Lewis and Robert Ayerst.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

The majority's contrary conclusion rests largely on the fact that Van Idour's violations of the Rules of Professional Conduct (RPCs) resulted in professional discipline. And that discipline might well protect the rights of Van Idour's own potential future clients. But it does nothing to protect Lewis' and Ayerst's rights or the rights of other indigent criminal defendants who might be subject to such attorney misconduct. That is because treating professional discipline as the antidote to all the problems this lawyer caused undermines this court's critically important Standards for Indigent Defense (SIDs) (available in compilations of the criminal rules following CrR 3.1). The SIDs impose specific, mandatory rules like caseload limits and reporting requirements on appointed counsel, and those rules aim "to address certain basic elements of public defense practice related to the effective assistance of counsel." SID pmbl. Licensure in this state ensures that this court has the power to hold attorneys accountable for following those important mandatory rules.

Today's decision is a departure from this court's otherwise steady progress toward ensuring that all defendants, regardless of economic resources, receive their constitutional right to assistance of counsel. I therefore respectfully dissent.

4

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

I.      FACTS AND PROCEDURAL BACKGROUND

A. Admission To Practice Law Background

To understand the magnitude of the errors in this case, I start with an

overview of this court's role in regulating the practice of law in Washington and a

summary of the relevant admissions processes and requirements.

Our state constitution vests judicial power in the Supreme Court. *Short v.*

*Demopolis*, 103 Wn.2d 52, 62, 691 P.2d 163 (1984); WASH. CONST. art. IV, § 1.

Thus, this court "has the exclusive responsibility and the inherent power to

establish the qualifications for admission to practice law, and to admit and license

persons to practice law in this state."[1] APR 1(a); *Short*, 103 Wn.2d at 62; *Ratliff*,

100 Wn.2d at 215.

Pursuant to that power, this court has adopted the APRs. The APRs are

mandatory court rules that "set minimum qualifications for admission to the bar."

*Ratliff*, 100 Wn.2d at 216. An applicant "shall be admitted to the practice of law

and become an active member of the Bar only by order of the Supreme Court."

APR 1(b). Our admissions rules are "'necessary for the protection of the court, the

---

[1] WSBA was established by the legislature in the state bar act. *See* ch. RCW 2.48. "Although the act allows the bar to recommend rules and regulations, this court retains ultimate authority to promulgate and approve any such rules." *Ratliff*, 100 Wn.2d at 216.

5

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

proper administration of justice, . . . and for the public good and the protection of clients'." *Ratliff*, 100 Wn.2d at 215 (quoting *In re Bruen*, 102 Wash. 472, 475, 172 P. 1152 (1918)). In addition to establishing minimum educational qualifications, our admissions process also considers an attorney's character and fitness to practice. As we have previously explained, "Lawyers are 'entrusted with anxious responsibilities' to safeguard their clients' money, their confidences, and, in some cases, their lives. To protect against abuses of trust, anyone who seeks a license to practice law in Washington 'must be of good moral character and possess the requisite fitness to practice law.'" *Simmons*, 190 Wn.2d at 383 (citation omitted) (quoting *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 247, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957) (Frankfurter, J., concurring); APR 3(a)).

Like most states, Washington permits attorneys who are licensed in other United States jurisdictions to apply for admission to the Washington bar without taking a bar exam—a procedure called "admission by motion." APR 3(c). To apply for admission by motion, the lawyer must file a certificate from their licensing jurisdiction "certifying the lawyer's admission to practice, and the date thereof, and current good standing or the equivalent" and must "present satisfactory proof of active legal experience for at least three of the five years immediately preceding the filing of the application." APR 3(c)(1)(A), (B). These applicants for admission

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

by motion face WSBA character and fitness evaluations, including a background check. APR 22.1(a); APR 3(a).[2] Prior to admission, the applicant must also satisfy other requirements, such as successfully completing the Washington Law Component (WLC), which tests substantive principles of Washington law; completing "a minimum of 4 hours of education in a curriculum and under circumstances approved by the Bar"; paying a bar license fee; taking the oath of attorney; and filing additional licensing paperwork. APR 5(a), (b) (preadmission requirements).

While awaiting full admission to the bar under APR 3(c), an admission by motion applicant may also apply for a limited license to provide indigent legal services. APR 8(c)(3). To obtain that limited license under this rule, the person must apply to the bar and "shall be associated" with an active WSBA member, "who shall be the lawyer of record and responsible for the conduct of the matter." APR 8(c)(1), (2). Nothing in APR 8(c) permits an applicant to begin practicing law

---

[2] The "essential eligibility requirements for the practice of law" include "[t]he ability to exercise good judgment and to conduct oneself with a high degree of honesty, integrity, and trustworthiness in financial dealings, legal obligations, professional relationships, and in one's professional business"; "[t]he ability to conduct oneself in a manner that engenders respect for the law and adheres to the Washington Rules of Professional Conduct"; "[t]he ability to diligently, reliably, and timely perform legal tasks and fulfill professional obligations," among others. APR 20(e)(1)-(3).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

in Washington upon mere *submission* of an application. Instead, a person can obtain licensure to practice under APR 8(c) only "upon application *and approval*." (Emphasis added.)

Washington also permits out-of-state attorneys to appear pro hac vice[3] under certain conditions. APR 8(b). Pro hac vice admission requires approval by the court in which the applicant seeks to appear, application to the bar, payment of a fee (in most cases), and "association with an active lawyer member of the Bar, who shall be the lawyer of record therein, responsible for the conduct thereof, and present at proceedings unless excused by the court or tribunal." *Id.* Applicants seek and obtain pro hac vice representation on a case-by-case basis. *Id.*

Unlawful practice of law is a strict liability crime. *State v. Yishmael*, 195 Wn.2d 155, 172, 456 P.3d 1172 (2020); RCW 2.48.180(3)(a). A single violation of this statute is a gross misdemeanor and each subsequent violation, "whether alleged in the same or in subsequent prosecutions, is a class C felony." RCW 2.48.180(3)(a)-(b).

---

[3] "Pro hac vice admission" refers to the "[t]emporary admission of an out-of-jurisdiction lawyer to practice before a court in a specified case or set of cases." BLACK'S LAW DICTIONARY 59 (11th ed. 2019).

8

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

To sum up, this court possesses authority to regulate the practice of law in Washington. We have adopted comprehensive and detailed rules on admission to practice. These admissions rules are grounded in the need to protect clients and the public and to ensure the proper administration of justice. Admission to the bar is granted only by order of this court. None of the rules relevant here permit a person to begin practicing law in Washington upon mere submission of an application. And the legislature has deemed unlawful practice of law a crime—indeed, the legislature has deemed the continuing unlawful practice of law a felony. With these facts in mind, we turn to this case.

B. Facts and Procedural History

i. *Trial Court*

Sometime in 2016, Robert Van Idour sought out a contract with Asotin County (County) to provide indigent defense services. Amicus Curiae Br. of Am. Civ. Liberties Union of Wash. (ACLU), App. A (Stipulation) at 2. At that time, Van Idour was an attorney licensed in the state of Idaho. *Id*. In written communications with the County, Van Idour represented that he was "in the process of applying for admission to practice law in Washington," although at that time he had *not* yet applied for admission. *Id.*

9

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

On January 16, 2017, Van Idour applied for admission by motion under

APR 3(c) to WSBA. *Id.*

The County Board of Commissioners (Board) was aware that Van Idour was

not licensed in Washington. Resp. to Pers. Restraint Pet. (Lewis Resp. to PRP) at

38 (Wash. Ct. App. No. 37284-7-III (2020)). On January 25, 2017, one of the

county commissioners e-mailed County Superior Court Judge Scott Gallina about

the issue. *Id.* The commissioner noted the Board's concerns about Van Idour's lack

of licensure and asked Judge Gallina whether "we can offer him a contract as an

indigent defense attorney for the county at this point." *Id*. Judge Gallina responded,

"Yes I believe you can—conditioned on him satisfying all of the requirements of

APR 8." *Id.*

Despite the fact that Van Idour had not been admitted by motion under APR

3(c) and had not even applied for limited licensure under APR 8, the County

offered him the contract in late January 2017. Stipulation at 2. That contract

required Van Idour to be a WSBA member throughout its term of February 1, 2017

through January 31, 2018. *Id.* Van Idour signed the contract. *Id.*; Lewis Resp. to

PRP at 45 (signature page).

Van Idour then began practicing law in Washington—despite the fact that

his APR 3(c) application had not been approved, despite the fact that he had not

10

yet even applied for limited licensure under APR 8(c), and despite the fact that the

contract required Van Idour to be a WSBA member throughout its term.

Stipulation at 4.

On February 20, 2017, Van Idour submitted an application to WSBA for a

limited license to practice for purposes of providing indigent defense under APR

8(c). Stipulation at 3. This application was *denied* in November 2017. *Id.* at 3-4.

Throughout 2017, superior court personnel communicated with Van Idour

regarding his lack of licensure. *See* Lewis Resp. to PRP at 61-62. In March, the

court administrator e-mailed Van Idour to ask about the status of his application

and whether he had received a bar number yet. *Id*. Van Idour responded that he had

not heard anything yet, but that he had been told by a WSBA representative that

WSBA was "actively processing" his application. *Id*.

The County nevertheless continued to appoint Van Idour to represent

indigent criminal defendants. On March 27, the court appointed Van Idour to

represent petitioner Ayerst. Resp. to PRP at 26 (Ayerst Resp. to PRP) (Wash. Ct.

App. No. 36965-0-III (2020)) (Mot. & Ord. Allowing Withdrawal & Substitution

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

of Att'y). On April 5, the court appointed Van Idour to represent petitioner Lewis.[4]
Lewis Resp. to PRP at 30 (Bond Ord.).

In September, the court administrator e-mailed WSBA Admissions inquiring about the status of Van Idour's application. *Id.* at 63. The WSBA representative responded, "I can only tell you that it is still being reviewed by regulatory service counsel." *Id.*

On September 20, 2017, a staff member of the state Office of Public Defense (OPD) sent an e-mail to the County risk manager asking about Van Idour's status. Br. of Pet'r at 50 (Wash. Ct. App. No. 37284-7-II (2019)). OPD had noticed that the County had entered into a felony contract with Van Idour, but that Van Idour "appears to not be a licensed attorney within Washington." *Id.* OPD inquired "as to what arrangement might be in place for an out-of-state attorney to take on a full-time felony contract." *Id*. The County responded by representing that Van Idour was "under the supervision of Neil Cox, Pro Hac Vice" and that the County was "currently waiting on WSBA." *Id.* at 49-50. However, there is no evidence in the

---

[4] Ayerst was charged with second degree attempted burglary and second degree malicious mischief. The information was later amended to add a charge of bail jumping. Lewis was charged with first degree assault with a deadly weapon, first degree robbery, possession of a controlled substance, and possession of paraphernalia.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

record that Van Idour applied for or received pro hac vice authorization at any

time.[5]

On October 6, 2017, Judge Gallina signed a document titled "Order for

Limited Admission to Practice," which states that Van Idour "shall be

provisionally admitted in Asotin County for the purpose of providing indigent

defense services in accordance with APR 8." Lewis Resp. to PRP at 65. The order

was backdated "Nunc Pro Tunc to February 1, 2017." *Id.*

On October 26, 2017, WSBA informed Van Idour that his APR 3(c)

application had been approved but that there were more steps he needed to take to

complete the admissions process. *Id.* at 79-80 (WSBA e-mail to Van Idour). One

of those steps was passing the WLC, a test covering substantive principles of

Washington law. *Id*. Van Idour notified the superior court that he had not yet

---

[5] As discussed above, pro hac vice licensure requires application to WSBA in addition to permission from the court. In September 2017, the court requested that Van Idour submit to it a draft of a pro hac vice order. Lewis Resp. to PRP at 72-73 (Oct. 24, 2017 e-mail exchange). Van Idour submitted drafts of an order purporting to serve as a "general" pro hac vice order covering all 100+ of his assigned cases. *Id.* at 75 (Oct. 26, 2017 e-mail). There is no evidence in the record that former judge Gallina ultimately signed or entered any pro hac vice order, or that any pro hac vice order was submitted to WSBA in Lewis' or Ayerst's cases.

13

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

completed the additional requirements and did not yet have a bar number. *Id.* The record lacks proof that Van Idour ever completed these additional requirements.

In November 2017, WSBA informed Van Idour that his application for limited admission under APR 8(c) was *denied* because he did not meet the criteria for limited admission under that rule. Stipulation at 3-4.

On January 31, 2018, Van Idour told the superior court that WSBA counsel had informed him that the backdated "Order for Limited Admission" signed by Judge Gallina was not a sufficient basis for him to practice in the superior court. Lewis Resp. to PRP at 83 (e-mail).

The same day, Judge Gallina directed Van Idour to contact the other public defenders and "plan for the immediate transfer of all of your pending cases should that become necessary by the February 5, 2018, docket." *Id*.

On February 13, 2018, WSBA informed Judge Gallina that Van Idour was not licensed to practice law in Washington and requested information about the representations Van Idour had made relating to his authority to practice in Washington. *Id.* at 41 (letter from WSBA Regulatory Services counsel).

ii. *Appeals*

Lewis and Ayerst both appealed. On April 11, 2019, the Court of Appeals affirmed both convictions in separate unpublished decisions. *State v. Lewis*, No.

14

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

35775-9-III, slip op. at 6-7 (Wash. Ct. App. Apr. 11, 2019) (unpublished),

https://www.courts.wa.gov/opinions/pdf/357759_unp.pdf; *State v. Ayerst*, No.

35867-4-III, slip op. at 1, 5 (Wash. Ct. App. Apr. 11, 2019) (unpublished),

https://www.courts.wa.gov/opinions/pdf/358674_ord.pdf.

### iii.    Personal Restraint Petitions

On April 19, 2019, Lewis' appointed appellate counsel, Lise Ellner,

contacted WSBA at Lewis' request to ask about Van Idour's license status. Br. of

Pet'r at 42 (Wash. Ct. App. No. 37284-7-III (2019). Lewis had heard a rumor that

Van Idour was not licensed, so she followed up. *Id.* WSBA disciplinary counsel

informed Ellner that WSBA was bringing a disciplinary proceeding against Van

Idour after an investigation revealed that Van Idour was never licensed to practice

law in Washington. *Id.*

Ellner was subsequently appointed to represent Lewis and Ayerst in their

separate PRPs. Both petitioners argued that their trial court representation by Van

Idour constituted per se reversible error because Van Idour was not licensed to

practice law in Washington.

On May 21, 2021, the Court of Appeals filed a decision denying Ayerst's

PRP. *In re Pers. Restraint of Ayerst*, 17 Wn. App. 2d 356, 486 P.3d 943 (2021)

(published in part). In the published portion of the decision, the court agreed with

15

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

Ayerst that "because Mr. Ayerst's attorney was not licensed in Washington, he did

not have 'counsel' as that term is defined for constitutional purposes." *Id.* at 360

(citing *Ratliff*, 100 Wn.2d at 217). But that court also held that the error was not

structural and did not require reversal because Van Idour was licensed in Idaho. *Id.*

at 362. It reasoned that courts "have generally agreed structural error applies to

representation by an unlicensed attorney only if the attorney has never been

licensed in any jurisdiction." *Id.* at 361 (citing *Solina v. United States*, 709 F.2d

160, 167 (2d Cir. 1983)).[6] The unpublished opinion in *Lewis* denied Lewis'

deprivation of counsel claim for identical reasons. *In re Pers. Restraint of Lewis*,

No. 37284-7-III (Wash. Ct. App. May 4, 2021) (unpublished),

https://www.courts.wa.gov/opinions/pdf/372847_ord.pdf.

a. Results of WSBA investigation

On July 28, 2021, WSBA filed a "Stipulation to Suspension" in Van Idour's

case. Van Idour stipulated that he knew that the October 6, 2017 "Order for

Limited Admission" did not constitute admission to practice law in Washington;

that he knew that preliminary approval of his APR 3(c) admission motion alone did

---

[6] The unpublished portion of the opinion denied Ayerst's remaining claims.

16

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

not constitute admission to practice law in Washington; and that he was never authorized to practice law in Washington on any other basis. Stipulation at 2-4.

Van Idour also stipulated that he committed a knowing violation of RPC 5.5(a) and 5.5(b) for practicing law in Washington without authorization. *Id.* at 4. He further stipulated to a six-month suspension for this knowing conduct. *Id.* at 5. As stated in the stipulation, "Suspension is generally appropriate when a lawyer *knowingly* engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system." *Id.* (emphasis added).

This court determined that a greater sanction was warranted and imposed an 18-month suspension during which Van Idour was "enjoined from practicing law in Washington or from seeking admission to practice law in Washington in any form." Ord. Imposing 18-Month Suspension (Wash. Sup. Ct. Sept. 7, 2021).

b. Review in this court

Lewis and Ayerst sought review in this court.[7] We granted review of the denial of counsel claim and consolidated the cases.

_____

[7] Amici Defender Initiative, OPD, and the ACLU filed briefs in support of review.

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

ANALYSIS

I.   *RATLIFF* CONTROLS THE OUTCOME OF THIS CASE AND REQUIRES REVERSAL:
     A PERSON WHO IS PERMITTED TO PRACTICE LAW ONLY UNDER CERTAIN
     CONDITIONS RELATING TO THE QUALITY AND OVERSIGHT OF THAT
     REPRESENTATION, AND WHO FAILS TO COMPLY WITH THOSE CONDITIONS, IS
     NOT "COUNSEL" UNDER THE SIXTH AMENDMENT

The facts in this case are egregious: Van Idour knowingly engaged in conduct that violated his professional duty and caused injury or potential injury, per the stipulation; the penalty imposed was suspension, which applies only when the violation reaches that "knowingly" standard; Judge Gallina's backdated order did not admit Van Idour to practice in Washington, and, according to the stipulation, Van Idour knew this; WSBA ultimately denied, not approved, his admission to practice under APR 8(c), so there was obviously something wanting; and Van Idour never completed the requirements to gain admission under APR 3. We therefore have an out-of-state lawyer who was never admitted in Washington despite applying, who never complied with certain mandatory Washington rules of practice or subjected himself to oversight by WSBA, who failed to complete the prerequisite to practice that tested his knowledge of Washington law, who suffered suspension for all that knowing conduct committed at the expense of indigent clients who had no knowledge of his problems, and who appears to have violated

18

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

the mandatory SIDs.[8] Yet the majority holds that Van Idour's egregious and knowing failure to obtain licensure or to comply with other applicable conditions on practice bears no relationship to the Sixth Amendment right to counsel of his indigent clients, the petitioners.

The majority's holding contravenes controlling precedent. In *Ratliff*, 100 Wn.2d at 213, we held that such a failure to comply with conditions on practice *does* violate the Sixth Amendment right to counsel. That holding applies here.

In *Ratliff*, assigned counsel failed to show up in court for Ratliff's trial. *Id.* The court ordered a Rule 9 legal intern, who was representing Ratliff in a different matter, to defend Ratliff instead. The Rule 9 intern knew little about the case and asked for a continuance because he was not prepared. The court denied the continuance motion and ordered the intern, over objection, to represent Ratliff immediately in his bench trial. The court then found Ratliff guilty. Ratliff appealed, arguing that he was denied effective assistance of counsel because the intern lacked necessary time to prepare for trial and consult with his supervising attorney (as required by APR 9). *Id.* at 215. The Court of Appeals sua sponte raised

---

[8] *See* Br. of Amici Curiae Def. Initiative & Wash. Def. Ass'n, App. at 1 (June 18, 2021 e-mail from the County clerk confirming that Van Idour submitted only one CrR 3.1 certification in 10 months, while the rule requires quarterly submission of such certifications).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

the issue of whether the unadmitted intern's representation was a per se denial of the right to counsel. *Id.*

This court held that the unadmitted intern's representation was ineffective; that it constituted a total deprivation of "counsel" within the meaning of the Sixth Amendment and article I, section 22; and that the remedy was reversal. *Id.* at 218. We explained our holding as follows: "Although one who is authorized to practice only under certain conditions, such as a legal intern, may be considered 'counsel' for constitutional purposes, this is so *only* when he or she complies with those conditions." *Id.* Because the trial court prevented the Rule 9 intern from complying with the condition that he consult with his supervising attorney before trial, the intern did not qualify as constitutional "counsel."

Our decision began with the rule that this court is constitutionally vested with the judicial power and that that judicial power includes the "inviolate" power to "regulate the practice of law in this state." *Id.* at 215 (citing WASH. CONST. art. IV, § 1). We explained that our exercise of this power to regulate the practice is not a technicality, but is "'necessary for the protection of the court, the proper administration of justice, . . . and for the public good and the protection of clients.'" *Id.* (quoting *Bruen*, 102 Wash. at 475). We continued that our adoption of

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

the APRs, which "set minimum qualifications for admission to the bar," was part of our exercise of that power. *Id.* at 216.

The issue in *Ratliff* concerned APR 9, which permits certain law students to engage in limited practice. *Id.* Rule 9 interns must comply with conditions designed to ensure that their clients receive competent, constitutional representation. They must be currently enrolled at an accredited law school and they must have completed two-thirds of their legal education. APR 9(b)(1)(A). Further, and critically, Rule 9 interns must be supervised by "an experienced and duly licensed member of the bar who agrees to serve as the rule 9 intern's supervising attorney." *Ratliff*, 100 Wn.2d at 216 (citing APR 9(b)(2)(ii)). "That attorney must supervise and assume professional responsibility for the legal intern's work." *Id.* (citing APR 9(d)(2)).

The attorney supervision requirement helps to ensure that the client "obtain[s] legal assistance sufficient to meet both federal and state constitutions," since "'counsel' as used in the Sixth Amendment and Const. art. [I], § 22 includes only those persons authorized by the courts to practice law." *Id.* at 217-18. In other words, APR 9's admitted-lawyer supervision requirement, and the quality of practice, supervision, and accountability that it provides, is what makes APR 9 representation constitutional. *Id.* at 218. "[I]n contrast to representation in

21

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

accordance with governing rules, representation by a law student intern who fails to comply with the conditions placed upon his or her practice does constitute an absolute denial of the right to counsel[,] which requires reversal." *Id.* at 219. Finally, we concluded that "[a]lthough one who is authorized to practice only under certain conditions, *such as* a legal intern, may be considered 'counsel' for constitutional purposes, this is so *only* when he or she complies with those conditions." *Id.* at 218 (some emphasis added).

The majority reads *Ratliff* as applying only to representation by Rule 9 interns. Majority at 13. But *Ratliff*'s language says just the opposite. *Ratliff* says that its requirement of complying with the supervision and licensure requirements applies to anyone "who is authorized to practice only under certain conditions," and it clarifies that it means *anyone* by following that quote with the expansive phrase, "*such as* a legal intern." 100 Wn.2d at 218 (emphasis added). The phrase "'such as' a legal intern" indicates that this rule includes but is not limited to Rule 9 interns.

The APR 9 conditions that *Ratliff* applied to anyone seeking limited authorization to practice included educational requirements and the requirement of supervision by a licensed Washington attorney. Such prerequisites to practice are

22

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

clearly linked to core Sixth Amendment issues of attorney competence and accountability.

APR 8, which is at issue in this case, has the same sort of competency and supervision requirements as APR 9—and those are the requirements that Van Idour violated. Van Idour began to practice law in Washington without having even applied for APR 8 licensure—and his APR 8 application was eventually denied. And he violated the rules requiring associated local counsel to act as counsel of record and to take responsibility for the proceedings.[9] As the majority acknowledges, that supervision requirement serves a substantive, not technical, purpose: it provides "'(1) reasonable assurance that the [out-of-state] attorney is competent and will conduct [themselves] in an ethical and respectful manner in the trial of the case, and (2) reasonable assurance that local rules of practice and procedure will be followed.'" Majority at 17 (alterations in original) (quoting *Hahn v. Boeing Co.*, 95 Wn.2d 28, 34, 621 P.2d 1263 (1980)).

---

[9] Although the record contains an "Affidavit of Attorney of Record," Lewis Resp. to PRP at 66, in which Washington attorney Neil Cox agreed to serve as attorney of record for Van Idour, there is no evidence that Cox actually served as attorney of record in either Lewis' or Ayerst's cases or was in any sense "responsible" for the conduct of the proceedings. Cox never filed a notice of appearance in either case. Cox was not present at any of the hearings in either case. Cox's name does not appear anywhere on the briefs in either case. Instead, the briefs show only Van Idour's name and no bar number.

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Van Idour also failed to comply with APR 3's conditions on practice that related to competence and accountability. He began to practice prior to being approved under APR 3—while his character and fitness investigation was pending. Although his APR 3 application was provisionally approved in late 2017, Van Idour never acquired admission to practice: he failed to complete the remaining mandatory requirements, including taking the WLC. The WLC tests knowledge of substantive law as a prerequisite to practice. The requirement to take the WLC is clearly connected to an attorney's ability to practice competently in our state.

*Ratliff*'s reasoning therefore applies with full force to this case, and no party has argued that *Ratliff* should be overruled as incorrect and harmful. Here, as in *Ratliff*, the conditions that Van Idour failed to comply with were important, were substantive, and were inextricably related to the Sixth Amendment right to competent and conflict-free counsel. The Court of Appeals therefore correctly concluded that Van Idour did not qualify as "counsel" under the controlling authority of *Ratliff. Ayerst*, 17 Wn. App. 2d at 360.

That court erred, however, in holding that such a denial of counsel did not require reversal. Denial of counsel (as opposed to ineffective assistance of counsel) constitutes structural error and requires reversal without further proof of prejudice. *See generally United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-50, 126 S. Ct.

24

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

2557, 165 L. Ed. 2d 409 (2006).  I would apply *Ratliff* to this case and reverse

because petitioners were denied assistance of counsel.

II. THE MAJORITY IMPROPERLY RESTRICTS *RATLIFF* TO RULE 9 INTERNS AND
RELIES ON NONBINDING, UNPERSUASIVE OUT-OF-STATE CASE LAW TO
REACH ITS CONCLUSION THAT REPRESENTATION BY AN UNLICENSED
LAWYER DOES NOT VIOLATE THE SIXTH AMENDMENT

The majority takes a different approach. Instead of following *Ratliff*, the

majority limits its application to the Rule 9 intern context. The majority then holds

that Van Idour's failure to comply with applicable practice rules constituted a

"technical violation that . . . does not rise to the level of a constitutional violation."

Majority at 21. The majority reaches this conclusion by failing to distinguish

between technical and substantive violations and by following nonbinding, out-of-

state case law that is either inapposite or unpersuasive.

A. Some rule violations are technical, but some are substantive—and the
rule violations at issue in Lewis' and Ayerst's cases are substantive

As discussed in Part I above, *Ratliff* should resolve this case in the

petitioners' favor.  But the generally accepted rule that some admission to practice

rule violations are technical and others are substantive also compels resolution of

this case in the petitioners' favor.

Indeed, courts regularly look to the purpose of a practice rule to determine

whether a violation of that rule constitutes a mere "technical" defect. The

25

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

violations that have little to no impact on attorney competency or accountability are typically deemed technical; the violations that have greater impact on attorney competency or accountability are typically deemed substantive. *E.g.*, *State v. Green*, 274 N.J. Super. 15, 26, 643 A.2d 18 (Ct. App. Div. 1994) (suspension of attorney for failing to pay bar fee did not disqualify him as counsel because "this oversight had no connection with the lawyer's character, intellectual acuity, or dedication to the client's interest"); *People v. Gamino*, 2012 IL App (1st) 101077, ¶ 22, 973 N.E.2d 1001, 362 Ill. Dec. 605 ("[A] criminal defendant who is unknowingly represented by an individual who has been disbarred or suspended from the practice of law for any reason relating to lack of legal ability or moral character suffers a *per se* violation of his sixth amendment right to effective assistance of counsel."); *Commonwealth v. Grant*, 992 A.2d 152, 159 (Pa. Super. Ct. 2010) ("Courts have consistently distinguished between technical licensing defects and serious violations of bar regulations reflecting an incompetence to practice law. . . . Where the attorney's license has been suspended or he/she has been disbarred for substantive violations, however, constitutional rights to counsel are violated and harm is presumed."). *But see State v. Newcome*, 62 Ohio App. 3d 619, 620, 577 N.E.2d 125 (1989) (applying per se rule that attorney's suspension disqualified attorney from status as Sixth Amendment "counsel").

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

Most often, courts will call a defect "technical" when the attorney (1) was already licensed in the forum state in the first instance and (2) later violated a practice rule that was minor and attenuated from issues of competence and fitness.[10] *E.g.*, *Green*, 274 N.J. Super. at 26; *Cantu v. State*, 930 S.W.2d 594 (Tex. Crim. App. 1996) (suspension of Texas attorney by Texas bar for failing to provide information to bar, which bore no relation to representation of client, did not retroactively disqualify attorney as "counsel").

For example, the Seventh Circuit Court of Appeals in *Reese v. Peters* distinguished between "technical" rule violations, like failure to pay bar dues, and violations of rules that are linked to the protection of clients. 926 F.2d 668, 670

---

[10] The majority overstates the degree to which courts agree on whether an attorney's violation of a practice rule implicates the attorney's competence and fitness. Majority at 22. For example, the Ohio Court of Appeals has held that where "an attorney repeatedly fails to comply with basic registration and continuing legal education requirements, one cannot help but question whether the attorney is providing competent legal representation, including exercising reasonable judgment, paying sufficient attention to issues pertinent to the representation and giving an accused proper legal advice." *State v. J.R.*, __ Ohio App. 3d __, 2022-Ohio-1664, 190 N.E.3d 1186, 1205 (footnote omitted). That court questioned whether it is possible to have "confidence that the attorney is effectively representing" their clients if the attorney "cannot be bothered to comply with these most basic requirements of practicing law in the state." *Id.* at 1206; *see also People v. Brewer*, 88 Mich. App. 756, 762, 279 N.W.2d 307 (1979) (holding that in ineffective assistance of counsel context, "the failure of an attorney to remit his state bar dues is strong evidence that such attorney is no longer sufficiently interested in the practice of law to adequately defend his client's interests").

(7th Cir. 1991). In *Reese*, an Illinois attorney represented criminal defendant Reese in Illinois state court. *Id.* at 669. While representing Reese, the attorney was suspended by the Illinois bar for failing to pay bar dues. *Id.* The issue presented to the federal court on collateral review was whether the temporary, later cured, suspension for failure to pay affected the attorney's status as "counsel" under the Sixth Amendment. *Id.*

The *Reese* court denied relief. But it did so because the particular rule violation at issue there—suspension due to temporary failure to pay bar dues alone—did not affect the attorney's status as "counsel." It classified a licensed attorney's single failure to pay bar dues out of "neglect[]," *id.* at 669, rather than purposeful conduct, as a technical violation—an example of a case where a person had initially "satisfied the court of their legal skills but later ran afoul of some technical rule." *Id.* at 670. It explained that "[l]awyers who do not pay their dues violate a legal norm, but not one established for the protection of clients." *Id.* Thus, *Reese* distinguished between truly "technical" rule violations done out of "neglect[]" and violations of rules that are linked to the protection of clients—and it made clear that violating a rule designed to protect clients is not a technical defect. *Id.*

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

The key in *Reese*'s reasoning is that the attorney had been, in the first instance, authorized to practice law by the Illinois court before which he was practicing. *Id.* His later failure to pay dues did not affect the Illinois court's earlier conclusion that it was "satisfied . . . of the advocate's competence and authorized him to practice law." *Id.* *Reese* stated, "The *constitutional* question is whether *the court* has satisfied itself of the advocate's competence and authorized him to practice law." *Id.* (some emphasis added). "The court" to which *Reese* referred was the court that initially licensed the attorney to practice. *Id.*

The majority quotes this sentence in *Reese* to support its argument that once an attorney has been found fit to practice in *any* court, there is no Sixth Amendment violation when that attorney represents a defendant in a court in which they were never authorized to practice. Majority at 20. As the text above shows, however, that's not what this sentence in *Reese* said. Under *Reese*'s actual holding and analysis, the Washington Supreme Court (and WSBA) never made the necessary initial conclusion about Van Idour's "competence" and never authorized Van Idour to practice in the first place.

The majority fails to address these differences between technical and substantive violations and the fact that rules implicating attorney competency and accountability must be treated as substantive. The portions of APRs 3 and 8 that

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Van Idour violated do concern attorney competency, supervision, and accountability. For that reason, they are inextricably intertwined with the Sixth Amendment right to counsel. Even if *Ratliff* were not binding precedent, I would still hold that Van Idour's particular violations of those particular rules in these cases were substantive violations and that they constituted a deprivation of counsel in the constitutional sense.

> B. The out-of-state decisions on which the majority relies generally address truly technical violations, so they are inapplicable here

The majority takes a different path. It characterizes Van Idour's rule violations as "technical" defects and concludes that "not every technical defect in an attorney's license status rises to the level of a Sixth Amendment violation." Majority at 25.

The majority's brief conclusion about the supposedly technical nature of Van Idour's violations stems from its adoption of the holding of *Kieser v. New York*, 56 F.3d 16 (2d Cir. 1995) (per curiam), a nonbinding Second Circuit decision that did not discuss the difference between substantive and technical rule violations. Indeed, the rule violations at issue in *Kieser* were different from the rule violations at issue in this case. The facts were somewhat similar: a New Jersey attorney represented a defendant in New York state court without obtaining a New

30

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

York license. *Id.* at 17. That New Jersey attorney was temporarily suspended by the New Jersey bar for failure to pay bar dues. *Id.* And to be sure, the *Kieser* court did state at one point that "[w]here [an] attorney has duly qualified and been admitted to practice in another jurisdiction but fails either to seek admission *pro hac vice* or to follow local court rules, the violation is a technical defect that does not represent a Sixth Amendment violation." *Id*. (citing *United States v. Bradford*, 238 F.2d 395, 397 (2d Cir. 1956); *People v. Cornwall*, 3 Ill. App. 3d 943, 277 N.E.2d 766 (1971); *State v. White*, 101 N.M. 310, 313, 681 P.2d 736 (Ct. App. 1984)).

But that statement about violation of local court rules was made in context. The context was the failure to pay dues in New Jersey and the lawyer's suspension, and reinstatement, in New Jersey before the New York criminal trial began. In that context, the court's conclusion that the first violation was technical is certainly persuasive; as that court continued, immediately after the sentence quoted above, "Where the defendants' attorneys have been suspended for merely technical reasons such as *nonpayment of bar dues*, the courts have ruled these grounds insufficient to warrant a conclusion of *per se* violation of the right to counsel." *Id*. at 17 (emphasis added).

31

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

*Kieser* is certainly correct to characterize failure to pay dues, thereafter cured, as a technical violation. But *Kieser*'s holding on that point does not apply to nontechnical defects; *Kieser* does not even talk about what would constitute a nontechnical defect.

To be sure, *Kieser* continues by stating that failure to apply for pro hac vice admission in New York is categorically "technical." *Id.* I respectfully disagree with *Kieser*'s conclusion on this point, made without any analysis of the difference between substantive and technical rule violations and without acknowledging authority to the contrary cited in Part I above.

The precedent on which *Kieser* relies does not help its conclusion (or the majority's conclusion) on that latter point either.[11] *Kieser* cites *Bradford*, 238 F.2d at 397, as support for its statement that failure to apply for limited admission to practice in a different state always constitutes a technical violation. But *Bradford* reviewed the constitutionality of a federal conviction and addressed only the Sixth

_____

[11] *Cornwall*, one of the three cases *Kieser* cites to support that latter point, is based on long-overruled principles of constitutional law. The holding of that case—that representation by retained counsel not licensed in the state did not constitute a Sixth Amendment violation—is almost entirely based on reasoning that directly conflicts with controlling United States Supreme Court cases including *Gideon*, *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). *See Cornwall*, 3 Ill. App. 3d at 945 (quoting *People v. Cox*, 12 Ill. 2d 265, 271, 146 N.E.2d 19 (1957)).

32

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

Amendment impact of representation by a licensed member of the New York state bar who neglected to apply for admission to a *federal* bar of the same state. *Id.* at 396. In that case, the failure to apply for admission was totally "inadverten[t]." *Id.* at 397. Further, in that case, the attorney was fully qualified for admission; as the Second Circuit put it, "We have no doubt that, had either counsel or the trial judge been aware of the omission [to apply], a motion to admit counsel for the purpose of trying the particular case would have been promptly granted." *Id.*

In this case, in contrast, Van Idour's application errors were not inadvertent but "knowing", they continued over a lengthy period of time, they involved failure to take a required exam testing competence in Washington law and lack of supervision by a Washington lawyer, and we cannot say that "a motion to admit counsel for the purpose of trying the[se] particular case[s] would have been promptly granted." *Id.* In fact, Van Idour's application for admission to practice in Washington under APR 8(c) was denied, and his APR 3 application was only provisionally approved, but he never finished the prerequisites (including testing his Washington law competency) to actually be admitted.

*Bradford,* like *Kieser*, might well be persuasive when applied to similar facts. But the facts in Lewis' and Ayerst's cases are not similar to *Bradford*.

33

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

In other words, the holding of *Ratliff* controls. The applicability of *Ratliff* to this case finds support in out-of-jurisdiction decisions that take the time to meaningfully distinguish between technical and substantive violations of practice rules. The majority's discussion of those out-of-jurisdiction decisions is unpersuasive, since those cases generally fail to do such an analysis.

C. The majority's conclusions about the historical meaning of "counsel" are not supported by the case it cites

The gravamen of the majority's argument is that it is sufficient to qualify as Sixth Amendment "counsel" as long as a person has been licensed as an attorney by some jurisdiction at some time. In addition to citing the out-of-jurisdiction cases above, the majority engages in a historical discussion to make this argument and relies primarily on *Turner v. Am. Bar Ass'n*, 407 F. Supp. 451, 474 (N.D. Tex. 1975), *aff'd sub nom. Taylor v. Montgomery*, 539 F.2d 715 (7th Cir. 1976), *and Pilla v. Am. Bar Ass'n*, 542 F.2d 56 (8th Cir. 1976). As we recognized in *Ratliff*, the *Turner* case provides a good historical overview of the meaning of "counsel" in the context of whether layperson representation can constitute assistance of counsel in the constitutional sense. 100 Wn.2d at 217.

But *Turner*'s historical analysis does not support the majority's conclusion that licensure by *any* court qualifies the lawyer as Sixth Amendment counsel in a

34

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

different jurisdiction's court.[12] *Turner* addressed the issue of whether the constitution provides the defendant with a right to representation by "unlicensed lay counsel"; it concluded that the answer is no. 407 F. Supp. at 457. To explain why, *Turner* examined the history of legal practice in common law England and concluded that "[f]or centuries prior to the enactment of the Sixth Amendment," courts did not permit representation by unlicensed laypersons. *Id.* at 474. Instead, "[t]he Courts were given the particular responsibility of qualifying lawyers who practice before them on the basis of training and character." *Id.* at 473. In the United States, this practice of "admission upon qualification" endured. *Id.* at 474. While admissions requirements varied from state to state, the *Turner* court observed that "[n]otwithstanding the apparent ease with which one could enter the practice of law in some States, one did not do so except by permission of some governing body, and laymen did not practice law." [13] *Id.*

---

[12] I agree with the majority that a person who has never been licensed to practice law anywhere can never constitute "counsel" for Sixth Amendment purposes. Majority at 22 (citing *Cantu*, 930 S.W.2d at 596 (collecting cases)).

[13] The majority faults the petitioners for not recognizing that "courts have delegated this historical approval process to bar associations and/or pro hac vice authorization, and consequently, that licensure inherently includes an approval of an attorney's fitness to practice that is not limited by state lines." Majority at 21. This statement's conclusion does not follow from its premise. Whether the state that issued an attorney's "licens[ur]e"—here, Idaho—believes that it has "approv[ed] of . . . [that] attorney's fitness to practice" *elsewhere* is irrelevant to this case. Van Idour was never

35

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

The point of this discussion in *Turner* was to illustrate that although admissions practices were different in the past, it has always been *necessary* to be licensed by a court to qualify as Sixth Amendment "counsel." *Id.* That is the proposition for which *Ratliff* cited the case. 100 Wn.2d at 217 (*Turner* explains that "'counsel', as used in the Sixth Amendment, encompasses only those persons a court has adjudged 'fit to practice by virtue of [their] character and/or training'"); *see also People v. Felder*, 47 N.Y.2d 287, 294, 418 N.Y.S.2d 295, 391 N.E.2d 1274 (1979) (*Turner* explains that Sixth Amendment "counsel" "can mean nothing *less* than a licensed attorney at law" (emphasis added)). But *Turner* does not suggest that out-of-state licensure is always *sufficient* to qualify an out-of-state attorney as "counsel" within a different state's courts. Rather, *Turner* suggests the opposite—that historically, permission to practice was granted on a court-by-court basis:

> For centuries prior to the enactment of the Sixth Amendment, the English forerunner of the American lawyer was called or invited to practice for *a Court* only after *the Court* had satisfied itself that a person was fit to practice by virtue of his character and/or training.

licensed in Washington. The question is whether Van Idour's failure to obtain licensure *in Washington* affects his status as "counsel" for purposes of the Sixth Amendment.

36

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

407 F. Supp. at 474 (emphasis added); *see also id.* at 473 ("The Courts were given the particular responsibility of qualifying lawyers *who practice before them* on the basis of training and character." (emphasis added)). This language suggests that one court's authorization to practice did not constitute a blanket admission to practice before any other court, no matter the jurisdiction.[14]

Indeed, that conclusion finds support elsewhere in the *Turner* decision, where the court emphasizes the historical power of individual states to set requirements for the practice of law within their jurisdictions:

> [T]his Court has not found any case which has called into the question the Centuries-old power *of the State in the first instance to set minimum standards for entry into the profession*. Indeed, the most recent pronouncement from the Supreme Court solidly reaffirmed the compelling interests that States have in the regulation of the practice of professions within their boundaries.

---

[14] The point of the majority's discussion of the concept of admission pro hac vice is unclear. Admission pro hac vice has long existed as a means by which a court *may* qualify or permit an out-of-state attorney to practice before it. Thus, it is correct that the "'enduring practice of admission pro hac vice demonstrates that there is no one-to-one correspondence between 'Counsel' and membership in the local bar.'" Majority at 20 (quoting *Reese*, 926 F.2d at 670). But admission pro hac vice still requires a court to *permit* the person to practice in the first instance. In our state, admission pro hac vice requires both the permission of the court in which the attorney appears as well as an application made to WSBA, association with local counsel who must serve as attorney of record and appear at proceedings unless excused by the court, and usually payment of a fee. APR 8(b).

37

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

*Id.* at 475 (emphasis added) (citing *Goldfarb v. Va. State Bar*, 421 U.S. 773, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975)).

Thus, *Turner*'s historical analysis does not support the majority's erroneous answer to the question presented in this case: whether Van Idour's failure to obtain permission to practice law in Washington, pursuant to Washington's minimum standards for entry, precluded him from attaining the status of "counsel." As discussed above, I would resolve that question by holding that Van Idour's failure to obtain permission to practice law in Washington disqualified him from attaining the status of counsel in petitioners' cases.

### D. An actual conflict of interest adversely impacted Van Idour's performance

Petitioners should prevail based on our controlling decision in *Ratliff*, based on the substantive nature of Van Idour's violations, based on the distinguishing features of the majority's out-of-jurisdiction case citations, and based on the constitutional rule established by the United States Supreme Court that deprivation of counsel constitutes structural error requiring reversal. Thus, I would not reach petitioners' claim that Van Idour's representation created an actual conflict of interest.

38

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

But the majority does reach it, so I am compelled to point out its error. The majority overlooks an actual conflict of interest that is apparent from the record here.

The majority correctly notes that the Sixth Amendment "protects a criminal defendant's right to effective assistance of counsel free from conflicts of interest." Majority at 26 (citing *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *State v. Myers*, 86 Wn.2d 419, 424, 545 P.2d 538 (1976)). It appropriately recognizes that if an actual conflict of interest adversely affects the adequacy of counsel's representation, reversal is required without an additional showing of prejudice. *Id.* at 11-12 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 349-50, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). And it correctly recognizes that to constitute an "actual conflict," the asserted conflict itself "'must cause some lapse in representation contrary to the defendant's interests,'" or "have 'likely' affected particular aspects of counsel's advocacy on behalf of the defendant." *State v. Regan*, 143 Wn. App. 419, 428, 177 P.3d 783 (2008) (internal quotation marks omitted) (quoting *State v. Robinson*, 79 Wn. App. 386, 395, 902 P.2d 652 (1995); *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992)). No other adverse effect need be shown.

39

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

But the majority overlooks the fact that petitioners have shown just such an actual conflict that was "likely" to affect counsel's advocacy. The petitioners have not provided the record of their trials for our consideration. But the conflict and the "likely" effect it had on Van Idour's performance is still apparent.

Petitioners argue that Van Idour had a conflict of interest because his unlicensed status meant he was committing the per se crime of unlawful practice of law each time he appeared in court to represent them. Suppl. Br. of Pet'r at 15. They say that this was a problem.

They make a good point. Given human nature, that certainly sounds like a conflict that makes it "likely" that the conflict itself created an incentive to shirk from vigorous representation. As other courts have recognized, where a lawyer representing clients commits a crime by doing so, the act of representation itself places the lawyer in "fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge" to inquire further into their credentials. *Solina*, 709 F.2d at 164. Further, as the majority recognizes, knowingly practicing without authorization "affects an advocate's duty of loyalty to their client, encouraging the advocate to protect themselves by presenting a less-than-vigorous defense." Majority at 28 (citing *Blanton v. United States*, 896 F. Supp. 1451, 1464 (M.D.

40

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

Tenn. 1995)). Van Idour, as I've mentioned, stipulated that he acted knowingly and that he knew he was not admitted to practice law in Washington at any time.[15]

Thus, I disagree with the majority's conclusion that Van Idour's predicament posed no conflict of interest for his clients.

III.    THE MAJORITY'S DECISION DETRIMENTALLY IMPACTS THE RIGHTS OF THE MOST VULNERABLE

This court has strongly supported increasing access to justice. Part of that commitment is reflected in our adoption of the SIDs, which aim to ensure that indigent criminal defendants receive competent, effective representation. These mandatory court rules were explicitly adopted to "to address certain basic elements of public defense practice related to the effective assistance of counsel." SID pmbl. Among other things, the SIDs "require attorneys to certify to the courts that they comply with caseload limits, meet minimal case-level qualifications requirements, have access to an office, and use appropriate investigative services." *Davison v. State*, 196 Wn.2d 285, 299, 466 P.3d 231 (2020) (citing CrR 3.1). Compliance with

_____

[15] The majority states that there could be no conflict of interest because "Van Idour believed, however incorrectly, that he was permitted to practice in Asotin County." Majority at 28. That's a startling assertion. The record actually shows that Van Idour expressly stipulated to knowing that neither his applications for admission nor the backdated order constituted admission to practice, that he "was never admitted or authorized to practice law in Washington on any other basis," and that he acted "knowingly." Stipulation at 2-5.

41

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

these rules is mandatory for any attorney representing indigent criminal defendants. *Id.*

Here, the petitioners did not choose Van Idour; he was assigned to them. He was assigned because the petitioners lacked financial resources and hence power to make a choice that a nonindigent criminal defendant could make. The record supports the inference that Van Idour misrepresented, or at least failed to disclose, his license status to his clients.[16] The record also shows that Van Idour failed to comply with the SIDs. Br. of Amici Curiae Def. Initiative & Wash. Def. Ass'n, App. at 1 (e-mail from Asotin County Clerk confirming that Van Idour submitted only one CrR 3.1 certification in 10 months). Van Idour's violations meant that the safeguards this court has imposed to protect indigent criminal defendants were not in place during the petitioners' felony trials.

The majority does not address these concerns. Instead, it undermines this court's own mandatory rules for admission designed to safeguard the protections of the Sixth Amendment. This is a step back from our court's historic commitment to

---

[16] Van Idour's previous assertion that he believed he was properly admitted to represent his assigned clients, Answer to Disciplinary Bd., No. 19-00008, conflicts directly with his later stipulation that he did know that he was not entitled to practice, thus implying that he misrepresented his status to the uninformed clients. *See* Stipulation at 4.

42

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

ensuring that all defendants, regardless of economic resources, receive the assistance of counsel to which they are constitutionally entitled.

CONCLUSION

In *Ratliff*, this court held that a person who is permitted to practice law only under certain conditions concerning competence, supervision, and accountability, and who fails to comply with those conditions, cannot be considered "counsel" under the Sixth (and Fourteenth) Amendment or the state constitution. We also held that "[d]enial of representation by one actually authorized to practice in court constitutes a denial of counsel, not merely ineffective assistance," and therefore requires reversal. *Ratliff*, 100 Wn.2d at 220. I would adhere to that precedent and reverse petitioners' convictions because Van Idour's knowing, egregious, and substantive licensure problems precluded him from qualifying as counsel in these proceedings.

I therefore respectfully dissent.

No. 99939-2 (consol. w/99941-4)
(Gordon McCloud, J., dissenting)

_____
Gordon McCloud, J.

_____
González, C.J.

_____
Yu, J.

_____
Whitener, J.